1  SEAN K. KENNEDY (No. 145632)
   Federal Public Defender
2  Sean_Kennedy@fd.org
   JOHN LITTRELL (No. 221601)
3  John_Littrell@fd.org
   Deputy Federal Public Defender
4  321 East Second Street
   Los Angeles, California  90012
5  Telephone (213) 894-5310
   Facsimile (213)894-0081
6
   Attorneys for Defendant
7  JOSEPH CARTER

8
                    UNITED STATES DISTRICT COURT
9
                   CENTRAL DISTRICT OF CALIFORNIA
10
                          WESTERN DIVISION
11

12  UNITED STATES OF AMERICA,        )    NO. CR 07-1141-VBF
13                 Plaintiff,        )    DEFENDANT'S SENTENCING
                                     )    POSITION PAPER AND
14         v.                        )    OBJECTIONS TO PRESENTENCE
                                     )    REPORT
15  JOSEPH CARTER                    )
                                     )    Date:      December 29, 2008
16                 Defendant.        )    Time:      11:00 a.m.
                                     )    Judge:     Hon. Valerie Baker
17  _____ )               Fairbank
                                          Court:     9
18

19      Defendant JOSEPH CARTER, through his counsel, Deputy Federal Public

20  Defender John Littrell, hereby submits his sentencing position paper, objections to the

21  Presentence Report ("PSR"), and exhibits.  Mr. Carter requests leave to make

22  additional objections at and before the sentencing hearing.

23

24                          Respectfully submitted,

25                          SEAN K. KENNEDY
                            Federal Public Defender
26

27
    DATED: December 9, 2008    By        /s/
28                                 JOHN L. LITTRELL
                                   Deputy Federal Public Defender

1   **I.      The Sentencing Reform Act**

2   Sentencing courts must consider the United States Sentencing Guideline

3   Manual as one among several factors when determining a reasonable sentence.  18

4   U.S.C. § 3553(a)(4). But courts must "tailor the sentence in light of other statutory

5   concerns as well."  United States v. Booker, 125 S. Ct. 738, 757 (2005); see 18 U.S.C.

6   § 3553(a).  The Sentencing Reform Act, 18 U.S.C. § 3553, requires courts to "impose

7   a sentence sufficient, but not greater than necessary, to comply with the purposes set

8   forth in paragraph 2."  Section 3553(a)(2) states that such purposes are:

9
10
     (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

11
12
     (B)    to afford adequate deterrence to criminal conduct;

13
     (C)    to protect the public from further crimes of the defendant; and

14
15
16
     (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

17   In determining the sentence, courts must consider "the nature and circumstances of the

18   offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1),

19   "the kinds of sentences available" 18 U.S.C. § 3553(a)(3), "the need to avoid

20   unwarranted sentence disparities among defendants with similar records who have

21   been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and "the need to

22   provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).

23
24
25
26
27
28

2

### A.   Mr. Carter's History and Circumstances

Joseph Carter grew up in a small town in Louisiana.  His mother and father were married and had six children.  Mr. Carter spent his youth fishing and hunting with his siblings, and working  with his great uncle, mowing lawns.

Mr. Carter's life became more complex, and more difficult, when his parents separated.  Mr. Carter was twelve years old when his parents ultimately divorced. Shortly thereafter, When Mr. Carter was only thirteen years old, his father was shot and killed.  The death of Mr. Carter's father was a shock to Mr. Carter and his family. His mother, Diane left Louisiana, taking the children with her to California.

Mr. Carter first saw Los Angeles when he was a teenager.  He and his family moved to Inglewood, California, in the early eighties.  This was the time that gang violence and crime was epidemic in African American neighborhoods in Los Angeles. Thus, as Mr. Carter reached his most difficult adolescent years, he was exposed to unparalleled violence and drug-related crime in his neighborhoods.[1]

Nonetheless, Mr. Carter continued working.  Because of his work, and because his family moved several times, Mr. Carter did not finish high school.  See PSR ¶ 55.

Mr. Carter started his own family when he was young.  He married his then-girlfriend, Karen, when Mr. Carter was only 19 years old.  See PSR ¶ 57.  The couple had five children, all of whom Mr. Carter maintained relationships with, despite the fact that he and his wife split up when the children were young.

Tragically, Mr. Carter's second son, Joseph, was shot and killed when Joseph Jr. was sixteen years old.  The reason for the shooting and the identity of the shooter remains a mystery.  Joseph Junior's death caused a wave of sorrow to wash over Mr. Carter, just like his father's death had.  He has yet to recover from either death.

---

[1]   The Presentence Report indicates many arrests and related conduct for Mr. Carter, see Presentence Report ("PSR") at ¶ 34-46, but much of the information related to arrests and offense conduct is inaccurate.  Mr. Carter has never been convicted of a serious crime and he has never spent any meaningful time in jail.

Mr. Carter has struggled to give his children a more stable and safe life than he had as a child.  He met his current fiancee, Rodnette Berger, over twenty years ago. They have been living together as a family for nearly as long.  The couple worked various jobs for years to save money to start their own business, a towing company.

For most of the past decade, Mr. Carter worked for an auto dismantling  yard, earning $15.75 per hour.  In August 2006, Mr. Carter formed JLC Towing ("JLC" are the initials of Mr. Carter's son, Joseph, who was murdered several years ago).  The company did well for a brief period, and Mr. Carter earned approximately $3,000.00 per month.  After Mr. Carter was arrested, his towing business failed.  When potential customers learned that Mr. Carter had been arrested, and that he was on pretrial release, they stopped giving him business.  Mr. Carter fell behind on his mortgage and had to sell his home at a loss.  Then he sold his tow truck, and his business.  Currently, Mr. Carter works part time as a delivery driver for the Recycler Magazine.

 Mr. Carter and Ms. Berger have had three children of their own, Jolean, Sholante, and Markeal.   Because of the mentorship, love, and unconditional support they provided, all three are healthy, sensitive, and compassionate young adults.  Ms. Berger compiled photographs and letters from each of the children, as well as numerous certificates of achievement, honors awarded to the children, and other material into a binder.  That binder has been submitted as Exhibit A to this filing.

Joelan, who is 18 years old, graduated with honors from high school last summer.  His father was in attendance, though he was on pretrial release in this case. See Exhibit A (Letter from Rodnette Berger).  Joelan is a student at Los Angeles Harbor college, and hopes to transfer to a four year college, and later, to get a Ph.D.

Sholante, who is 17 years old, is an ambitious junior in high school.  She will graduate on time next Summer.  In April 2008, she was honored with the High School Leadership Award from the University of Southern California.  Last Summer, she participated in the International Trade Education Summer Internship Program at the Port of Los Angeles. This fall, Sholante spent a week in Washington D.C. as part of

1  the National Youth Leadership Forum on National Security, where she explored

2  career paths in the fields of defense, intelligence, and diplomacy. <u>See</u> Exhibit A.

3       Markeal is the youngest, at age 14.  He is still forming his identity.  He looks up

4  to Mr. Carter perhaps more than any of the children, and wants to drive a tow truck,

5  just as Mr. Carter did before he lost his business.  <u>See</u> Exhibit A.

6

7       **B.    The Nature and Circumstance of the Offense**

8       Two years ago, Mr. Carter committed the offense when he made a series of

9  telephone calls, as a favor to a friend, during which he introduced a man named

10  "Juvie" (who was not a juvenile) who wanted drugs, to a man named "Riley," who

11  had them.  The PSR correctly summarizes the nature of the offense as follows:

12       On February 9, 2006, Carter communicated with Riley on Carter's telephone,

13       and in a series of telephone calls using coded language, arranged for the sale of

14       approximately 8 ounces or 226.8 grams of cocaine to another person through

15       Juvie, Riley's associate."

16  PSR at ¶ 9.  Mr. Carter did not have any drugs to sell.  He did not participate directly

17  in the transaction.  He did not get anything in return for introducing the men.  There is

18  no evidence that Riley, in fact, ever distributed drugs to the man named "Juvie."

19

20       **C.    The Advisory Guideline Calculations**

21       The parties agreed, pursuant to a plea agreement, that the applicable offense

22  level in this case was level 17.  <u>See</u> PSR ¶ 27.  Mr. Carter's criminal history category

23  is I.  PSR ¶ 33.  The advisory guideline sentencing range is 24-30 months.

24       Nonetheless, taking into account the circumstances of *this* offense – a series of

25  phone calls taking place during the course of one day, two years ago, during which

26  Mr. Carter introduced two men to one another and got nothing in return – and *this*

27  offender – a proud father, and provider who has experienced profound tragedy in his

28  life and who has lost his business and his livelihood as a result of his arrest in this case

1 – the Court should sentence Mr. Carter to a term of probation.

2

3      **D.**     **A Sentence of Probation Is Appropriate**

4      A term of probation will allow Mr. Carter to continue being a role model and

5 provider for his children. Although Joelan is an adult now, working and supporting

6 himself, Mr. Carter's daughter, Sholante, is a teenager at a critical point in her life,

7 and needs her father's support to ensure that she continues to be successful and

8 graduates from high school. Markeal, the youngest of Mr. Carter's children, needs his

9 father to help him through his adolescence and stay away from drugs and crime.

10 A term of probation is also reasonable given the relatively minor and fleeting nature

11 of the crime -- a series of telephone calls taking place nearly two years ago.

12      A term of probation appropriately reflects the seriousness of this offense.

13 Although dangerous drugs were contemplated, Mr. Carter neither bought, sold, nor

14 handled the drugs, and there is no evidence that the transaction ever in fact occurred.

15 Moreover, the quantity of drugs in this case, assuming they in fact existed, was

16 relatively small, and had a street value of less than five thousand dollars.

17      A term of probation is also reasonable as a means to punish Mr. Carter and

18 deter other offenses. Although Mr. Carter has been arrested in the past, he has never

19 spent much time in jail. More importantly, the pattern of law enforcement contacts

20 has diminished over time, as Mr. Carter grew older and more responsible, and as he

21 became more involved with his children and helped them prepare for their future.

22

23      **E.**     **The Probation Officer's Sentencing Recommendation Is Arbitrary**

24      The Probation Officer argues that the "seriousness of a narcotics offense is

25 measured primarily by the type of drug and the quantity." The drug type and quantity,

26 however, is a poor proxy for determining just punishment in this case. Because this

27 case involves the mere use of a telephone to facilitate a drug case, and because Mr.

28 Carter was not himself directly involved in the transaction, Mr. Carter did not have

any control over, or decision making authority with respect to the quantity and type of the drugs.  Even assuming that the quantity and type of drugs involved were a reasonable starting point for determining just punishment for a person directly involved in distributing drugs, (and they are not,) those facts were not a good starting point for the analysis in *this* case and considering *this* defendant, as Mr. Carter was neither the seller nor the buyer of the drugs, but merely introduced the buyer and seller of the drugs to one another and received nothing in return.

The Probation Officer also contends that a 24-month sentence is reasonable because it is approximately half of the mandatory minimum sentence that would be called for *if* two important variables were different; first, the charge were a more serious one -- 21 U.S.C. 846, 841 (conspiracy to possess with intent to distribute cocaine); and second, that the drug quantity was  500 grams -- more than twice the quantity of drugs involved in this case.  Using drug type and quantity to fashion a sentence is imprecise and unfair under any circumstances, but applying the Probation Officer's analysis would be plainly arbitrary.  The Probation Officer proposes to begin the analysis by analyzing the drug quantity and type in connection with (1) a more serious criminal charge to which Mr. Carter did not plead, (2) a mandatory minimum sentence that does not apply, and (3) assuming a quantity of drugs that is more than double the quantity of drugs involved in this case.  From that point, he works backward, suggesting that a sentence that is less than half of what a person would receive if all of the three assumed variables were present is a reasonable one.  This argument is inconsistent with the legislative intent of the statute.

First, Mr. Carter did not plead to the more serious charge of conspiracy to possess with intent to distribute cocaine.  There is no mandatory minimum sentence.  Mr. Carter pled to the lesser charge of using a telecommunications device to facilitate a drug transaction, 21 U.S.C § 843(b).  He did so pursuant to an agreement with the United States Attorney's Office, because Mr. Carter, was, in fact, less culpable than a common drug dealer.  Based on Mr. Carter's limited involvement and lack of personal

7

gain, he deserved a more lenient sentence, and in this case, a lesser charge.  Using an analytical framework that applies to a more serious charge to which Mr. Carter did not plead undermines the intent of the prosecuting authority to use a lesser charge to recognize Mr. Carter's relatively minor role in the offense.[2]

Second, the mandatory minimum sentences called for in 21 U.S.C. 841 are designed to punish drug "kingpins" and other high-level managers in drug trafficking organizations.   Five-year minimums were supposed to target "managers of the retail traffic" who were "filling the bags of heroin, packaging crack cocaine into vials . . . and doing so in substantial street quantities"; ten-year minimums were supposed to target "manufacturers or the heads of organizations" who were "responsible for creating and delivering very large quantities of drugs."  H.R. REP. No. 99-845, at 11-12, 16-17 (1986).  The mandatory minimums were correlated to drug quantities in order to identify first the mid-level traffickers, and then the "kingpins" and "masterminds." See 132 CONG. REC. S. 14, 300 (Sept. 30, 1986); see also 132 CONG. REC. 26, 473, 27,193 (1986); United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, at 48 (Nov. 2004); United States Sentencing Commission, "Report to Congress: Cocaine and Federal Sentencing Policy," at Chapter 6, pp. 5-6 (Feb. 1995); Paul J. Hofer & Mark H. Allenbaugh, "The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines," 40 Am. Crim. L. Rev. 19, 71-74 (2003).

Mr. Carter is not a "kingpin" or a "mid-level trafficker."  He never possessed

---

[2]  The Probation Officer recognizes elsewhere in the PSR that Mr. Carter pled guilty to a lesser offense because he played a minor role in the commission of the offense.  See PSR ¶ 19.  In fact, the Probation Officer argues that because Mr. Carter was given an opportunity to plead to a lesser offense, the "minor role" adjustment should not apply.  His reasoning in recommending against a minor role adjustment is that as a result of pleading to a lesser offense, Mr. Carter's "overall punishment exposure is lower." Id. Thus, it is puzzling that the Probation Officer uses, as a starting point for the analysis of just punishment, the very same higher "punishment exposure" that he contends that Mr. Carter avoided by pleading to a lesser charge.

1   any quantity of cocaine.  Rather, he made a few telephone calls, on one day, two years

2   ago, that assisted two men in discussing the distribution of eight ounces of cocaine.

3   Whereas Congress specified (in 21 U.S.C. § 841) that "kingpins" and "mid-level

4   traffickers," who are identifiable because of the type and quantity of drugs they

5   distribute, must be subject to mandatory minimum prison sentences, it made no such

6   provision for street-level offenders.  But taking the Probation Officer's analysis to its

7   logical conclusion would require prison sentences for any street-level dealer so long

8   as a prison term is called for by the advisory guidelines.  This reasoning converts the

9   drug table in United States Sentencing Guideline § 2D1.1 into a chart of *de facto*

10  mandatory minimum prison sentences.  This was not Congress' intent, and it violates

11  the Supreme Court's ruling in United States v. Booker, 125 S. Ct. 738, 757 (2005) by

12  effectively rendering the advisory guideline ranges in U.S.S.G. § 2D1.1 mandatory.

13       Third, the Probation Officer contends that sentencing Mr. Carter to probation

14  would result in an "unwarranted sentencing disparity."  But the Sentencing Reform

15  Act's directive to avoid "unwarranted sentencing disparity" applies to "defendants

16  with similar records who have been found guilty of similar conduct."  See 18 U.S.C. §

17  3553(a)(6).  The Probation Officer does not identify other offenders who have been

18  found guilty of similar conduct who have been sentenced to custodial terms similar to

19  what the Probation Officer recommends here.  Indeed, because the Probation Officer's

20  recommendation is based on the assumption that Mr. Carter committed conduct that

21  would be prohibited by a different, more serious statute, and because the Probation

22  Officer uses more than twice the quantity of drugs than were involved in this case as

23  his starting point in the analysis, the Probation Officer's recommendation would

24  appear to create, rather than avoid, an unwarranted sentencing disparity among

25  "defendants with similar records who have been found guilty of similar conduct."

26

27

28

1 **III.    Objections to the Presentence Report**

2       Mr. Carter respectfully objects to the following paragraphs in his PSR:

3

4       A.    Paragraphs 34-37:

5       The conduct described in paragraphs 34-37 was not committed by Mr. Carter,

6 and he was not arrested on the dates indicated in those paragraphs.  These offenses

7 may have been committed by another person who used Mr. Carter's name.

8

9       B.    Paragraph 40:

10       The conduct described in paragraph 40 was not committed by Mr. Carter, and

11 he was not arrested on the date indicated in that paragraph.

12

13       C.    Paragraphs 41-42:

14       The events described in paragraphs 41 and 42 are the same and originate from

15 the same arrest.  Mr. Carter did not receive stolen property, nor did he commit any of

16 the crimes indicated in Paragraph 42.  The person who reported those crimes admitted

17 that Mr. Carter was not involved in those offenses and Mr. Carter was released.

18

19       D.    Paragraph 43:

20       The conduct described in paragraph 43 was not committed by Mr. Carter, and

21 he was not arrested on the date indicated in that paragraph.

22

23       E.    Paragraph 45:

24       The description of the conduct in Paragraph 45 is inaccurate.  Mr. Carter was

25 "jumped" by three people.  He fought back to defend himself.  There was no pipe or

26 any other weapon involved.  Mr. Carter was not charged with any offense.

27

28

F.      Paragraph 46:

The description of the conduct in Paragraph 46 is inaccurate.  Mr. Carter did not use a false name, nor did he use a false identification or present false DMV documentation.  He used his true name, but Long Beach Police Officers did not believe him.  This may be the case because it appears that for several years, another person has been giving Mr. Carter's name when they have been arrested.

## IV.    Objections to Supervised Release Conditions

Mr. Carter respectfully objects to the following proposed conditions of his supervised release:

A.      Condition 4 (community service)

Mr. Carter objects to the condition that he perform 20 hours per week of community service as directed by the Probation Officer when he is not employed full-time or at least part time.  The Probation Officer recommends this condition on the ground that it would "motivate" Mr. Carter to pursue education and vocational training or remain steadily employed in order to avoid having to perform community service.  But Mr. Carter does not need motivation to work or pursue educational opportunities.  As the PSR indicates, Mr. Carter has worked consistently without interruption throughout his life to support his family.  See PSR ¶¶ 71-73.

1    **V.    Conclusion**

2            For the foregoing reasons, Mr. Carter respectfully requests that the Court

3    sentence him to a term of probation or other non-custodial sentence.

4

5                                               Respectfully submitted,

6                                               SEAN K. KENNEDY
                                                Acting Federal Public Defender
7

8    DATED: December 9, 2008          By_____/s/_____

9                                               JOHN L. LITTRELL
                                                Deputy Federal Public Defender
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served the DEFENDANT'S SENTENCING POSITION PAPER AND OBJECTIONS TO PRESENTENCE REPORT.

On December 9, 2008, following ordinary business practice, service was:

[X] Placed in a closed envelope, for collection and hand-delivery by our internal staff, addressed as follows:

[ ] By hand-delivery addressed as follows:

[ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ] By facsimile as follows:

[ ] By e-mail as follows:

Luis Rivas
United States Probation Officer
United States Court House
312 North Spring Street, Suite 700
Los Angeles, California 90012

This proof of service is executed at Los Angeles, California, on December 9, 2008.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Diana Elliott*
Diana Elliott

13